# AFFIDAVIT IN SUPPORT OF COMPLAINT

I, **Allyn Lynd**, having been duly sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for approximately eleven years. I am currently assigned to the FBI Dallas CYBER Squad which conducts investigations of theft of trade secrets, computer crimes including unauthorized access to protected computers, i.e., intrusions or hacking, and copyright infringement. For approximately the last ten years, I have been involved in the investigation of computer intrusions, copyright and trademark infringement violations, high-tech fraud, and theft of trade secrets. During my career as a Special Agent of the FBI, I have participated in numerous investigations involving the above-described offenses. I have interviewed a large number of individuals involved in the commission of the above offenses, and have participated in arrests regarding the same criminal violations. I have also examined documents, electronic and physical records, and other items recovered from the arrests of subjects and searches of premises involved in these types of activities. Additionally, I have received specialized training in the field of intellectual property rights and computer intrusions. Based on the above, I have developed expertise in the use of computers and electronic communications in various criminal activities.

1

2. This affidavit sets forth facts, and suggests reasonable inferences from those facts, establishing that there is probable cause to believe that the following individuals committed violations of 18 U.S.C.§§ 1512(b)(3), 1513b and 1513e.

1) **Matthew Weigman**
date of birth 
███████████████████████████ and

2) **Sean Paul Benton**
███████████████████████████
███████████████████████████

## APPLICABLE CRIMINAL STATUTES

3. There is probable cause to believe that **Weigman** and **Benton** have violated the provisions of 18 U.S.C. §§1512(b)(3), 1513(b) and 1513(e). The pertinent provisions of those criminal statutes are set forth below:

**§ 1512(b)(3) - Obstruction of Justice**

(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings,

shall be fined under this title or imprisoned not more than 20 years, or both.

## § 1513 - Retaliating against a witness, victim, or an informant.

(b) Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—

>(1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or

>(2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer;

Or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

## FACTS IN SUPPORT OF AFFIDAVIT

4. I make this affidavit in part on personal knowledge based on my participation in this investigation, upon the information provided to me by other law enforcement personnel, and, in part, upon information and belief. The sources of my information and beliefs are:

   a. Oral and written reports provided to me;
   b. Oral and written reports provided to me by a security officer employed by Comcast Cable Communications, LLC;
   c. Oral and written reports provided to me by a security officer employed by Frontier Communications;
   d. My independent investigation;
   e. Information provided by cooperating individuals; and
   f. Oral and written reports provided to me by employees of AT&T.
   g. Oral and written reports provided to me by employees of Verizon.

5. Since this affidavit is being submitted for the limited purpose of obtaining a complaint for the **Matthew Weigman** and **Sean Paul Benton,** I have not set forth each and every fact learned during the course of this investigation. Facts not set forth in the affidavit are not being relied upon for probable cause.

4

6. In early October 2006, based on a complaint by the Fort Worth Police Department (FWPD), I began an investigation into a group who were conspiring to commit violations of 18 U.S.C.§§371, 1029 and 1030. As part of that investigation I identified **Chad Ward, Jason Trowbridge, Stewart Rosoff,** and **Matthew Weigman** as leaders and organizers in the conspiracy. The object of the conspiracy was to access without authorization telecommunications providers computers in order to identify victims, then to use that unauthorized access along with spoofed, or masked, caller identification information (caller i.d.) in order to place false calls for emergency services which would appear to have originated from the phone numbers of the victims. This allowed the defendants to make the false emergency call appear genuine. They used these false calls to generate an emergency response, such as a police SWAT team at the victim's house with the goal of having a violent confrontation in which the victim was injured. The defendants also used their unauthorized access to the phone company systems to commit fraud by having their telephone usage charges, which often exceeded $25,000, removed from the billing computer. During the course of the investigation I learned that the defendants began their criminal conduct on or before November 2002 and that were responsible for hundreds of these false calls across the United States and into Canada. In the course of the criminal conduct, a number of people had been injured during confrontations with responding officers.

5

7. In early October 2006, following the information obtained from the FWPD, I confirmed with the Johnson County, Texas, Sheriff's Office that they had also received what appeared to be a false 911 emergency call in June of 2006 from someone claiming to be James Proulx, Stephanie's father, and this unknown individual had told the 911 operator that he had been using controlled substances, that he had an AK-47 assault rifle, that he had shot his wife, and that he wanted $50,000 or he was going to kill his daughter and any police who tried to stop him. The phone number identified the call as coming from the home of James Proulx in Alvarado, TX, the home of James Proulx. A SWAT team was dispatched to the location, and learned that the call had been a hoax. James Proulx was interviewed by the Sheriff's Office. Mr. Proulx denied making the call. Mr. Proulx further stated as follows:

    a. He had been receiving harassing phone calls from members of a phone chat line group who were mad at his daughter Stephanie;

    b. The phone chat line group members had been calling for about two weeks and making threats;

    c. A week earlier the phone chat line group members threatened to execute a hoax 911 call to his residence;

    d. The phone chat line group members were trying to harass Stephanie's family into putting pressure on Stephanie to cease her chat activities.

6

8.      On or about October 10, 2006, AT&T employees advised me they were familiar with the group conducting the criminal activity. AT&T told me that the criminal conduct had resulted in a number of state and local charges and convictions, but that they were unaware of any Federal prosecution of these offenses. AT&T investigators told me that as part of their investigation into these offenses, AT&T investigators and local law enforcement visited **Matthew Weigman**, then a minor, at his home in Boston. As of October 10, 2006, **Weigman** was aware he was being investigated for these offenses and for theft of services. AT&T also told me that Verizon was looking at the same group and was cooperating with various state and local agencies as part of ongoing investigations.

9.      On or about November 21, 2006, a cooperating witness (CW1) advised me as follows:

   a.      One member of the "swatting" group used the moniker of "little hacker" but his real name was **Matthew Weigman.**

   b.      CW1 had talked to **Matthew Weigman** on the telephone since early 2006.

   c.      In October 2006, **Matthew Weigman** claimed to be using his unauthorized access to a telephone company Network Operations Center (NOC) and the computers located there, to terminate phone services to individuals.

   d.      **Matthew Weigman** claimed to have this access by a variety of

7

means, including social engineering, a technique used by hackers to obtain confidential information and passwords through the impersonation of authorized individuals.

e. **Matthew Weigman, Guadalupe Santana Martinez, Stuart Rosoff, Jason Trowbridge,** and others belonged to the "swatting" group and that they cooperated together via computer and telephone to commit identity theft, fraud, theft of services, telephone harassment, and various other offenses.

f. **Matthew Weigman** was an individual responsible for altering telephone services in furtherance of this scheme.

g. Santana Martinez was an individual responsible for making harassing calls in furtherance of this scheme, hence his nickname of "Wicked Wizard".

h. Chad Aaron Ward was an individual who financed the operations, paying to have others swatted.

i. Jason Trowbridge was an individual responsible for using a commercial database to find identifying information about individuals for purposes of targeting them for the subsequent swatting operations.

j. The "swatting" group used commercial services to disguise and conceal who they were, such as online spoofing services and the purchase of telephone calling cards.

8

10. I identified a phone number originating at **Matthew Weigman**'s address as one which was used to gain unauthorized access to Frontier Telecommunications NOC in Rochester, New York beginning prior to October 2006 and extending to November, 2006.

11. In December 2006, I obtained and executed a search warrant for the home of **Matthew Weigman**. Determining that he was a minor, I interviewed him at his home in the presence of his mother. **Matthew Weigman** provided a confession and agreed to cooperate with the investigation into the conspiracy and was therefore fully aware that an ongoing investigation into the conspiracy was being conducted by the FBI. During the interview I received a phone call from one of the Verizon investigators, ▓▓▓▓▓▓▓▓, who was assisting in the investigation. **Weigman** recognized ▓▓▓'s voice and surmised that Smith was assisting in the investigation. Weigman named investigators with other telephone companies, asking if they were also assisting the FBI.

12. Although **Weigman** agreed to assist the FBI, he instead continued his criminal activities. One such continued activity included attempting to gain access to the voice mail system for the United States Attorney's office in Dallas. **Weigman** and his attorney were told in multiple conversations that the FBI was aware of his continued criminal activity and were warned that unless he ceased the activity he would be a target of the investigation and informed that his limited cooperation would not result in consideration from the government. **Weigman** continued his criminal activity despite the

9

warnings and the FBI severed their relationship with **Weigman** in early 2007. In early 2007, the government notified **Weigman** in writing that he was a target of the NDTX investigation.

13. In January 2007, Martinez was indicted and arrested for conspiracy to commit violations of 18 U.S.C. §371 to commit 18 U.S.C. §1029 (a)(9) access device fraud and §1030 (a)(5)(A)(iii) computer fraud. In June 2007, Trowbridge, Ward, Rosoff, and Angela Roberson were indicted and arrested for conspiracy to commit violations of 18 U.S.C. §371 to commit 18 U.S.C. §1029 (a)(9) access device fraud and §1030 (a)(5)(A)(iii) computer fraud. At the time of their arrest, both Martinez and Roberson confessed to the crimes and provided a written statement. Detention was sought and ultimately obtained for four of the five individuals. The government did not seek to detain Roberson.

14. Following the arrests, victims in California, New York, and Omaha contacted me and told me that they were being harassed by members of the conspiracy, including **Matthew Weigman**, in order to stop them from providing information to the FBI about the conspiracy. During these harassing calls, the harasser used some means of hiding his/her caller identification information. In addition, I was contacted multiple times by employees of both AT&T and Verizon and was told that the illegal activity was continuing and was now being orchestrated by **Matthew Weigman** and other unindicted

10

co-conspirators. I also reviewed letters sent to some of these individuals in which the senders mention that **Matthew Weigman** is not in jail and that he has the ability to continue the conspiracy.

15. By December 2007, all five indicted members of the conspiracy pleaded guilty to the charges and agreed to be debriefed. During the debriefings, each of these individuals told me that they remained in contact with people who were still participating in a telephone "party line" which was used by the conspiracy to coordinate their activities. Each reported to me as follows:

    a.    **Matthew Weigman** was still active in the conspiracy;

    b.    Learning personal identifying information about the victims was important, because that personal information was used to threaten the victims with harassment, swatting, firings, etc.;

    c.    They let the victim know that they had his/her identifying information, to threaten and frightened him/her into doing what the conspirators wanted; and

    d.    The conspiracy was responsible for hundreds of false emergency calls resulting in police responses, victims being evicted, victims being fired, and victims being frightened into cooperating with the conspiracy.

16. During this time, other party line members continued to contact me and tell

11

me that **Matthew Weigman** was threatening them and telling them not to cooperate with law enforcement. All of the party line members I spoke to were aware that there was an ongoing investigation into the conspiracy and that the FBI was continuing to monitor **Matthew Weigman**. In 2008, following all of the guilty pleas, as the defendants began to be sentenced, **Matthew Weigman** continued to call witnesses and victims and tell them not to cooperate with law enforcement. I spoke with unindicted co-conspirator ▆▆▆▆▆▆▆▆ who told me that **Matthew Weigman** was threatening her. I spoke with other witnesses who told me that **Matthew Weigman** had instructed them specifically not to speak with me. I spoke with other co-conspirators who told me that **Matthew Weigman** had threatened to injure and kill them and their family members, including in one case to kill a female witness' infant in front of her, if they were to cooperate with the FBI, all in violation of 18 U.S.C.§§ 1512(a)(2) and 1513(b)(3).

17.     **Weigman** was aware that there was an ongoing investigation and that he was a target of this investigation. He was also aware that Verizon and AT&T were cooperating in this investigation. A number of articles were written about the investigation for a magazine called Wired. It is my belief that **Weigman** cooperated in the writing of these articles based on the information contained in them. In addition, these articles also published copies of affidavits I had written during the investigation which included the fact that I had received information from AT&T and Verizon. I was

12

told by some of the party liner members that the affidavits were being read aloud on the party line so that **Weigman** could learn their contents. One of the AT&T employees who had cooperated contacted me after this was published and told me that he was receiving harassing calls at work based on the articles. I also believe that **Weigman** was provided access to or was told about some of the discovery materials which had been provided to defense attorneys based on what I was told by the threatened party liners. ▊was on the government's witness list prior to the fifth defendant pleading guilty and my reports of interviews of▊ were used in plea negotiations and provided to the Defense as discovery materials. ▊also wrote and submitted the Victim Witness Impact statement for Verizon. The government anticipates using ▊as a witness in future proceedings.

    18.    In April 2008, I was contacted by ▊ Verizon, who told me that **Matthew Weigman** had opened a telephone service account at his residence in the name of▊, who resided in Seagoville, TX. ▊believed that this account was a fraud account as it was being billed to ▊ and was opened in her name. I contacted ▊ who told me that she was the victim of identity theft, she did not know **Matthew Weigman**, and she had not authorized him to obtain service in her name. She also told me that other utility accounts and bank accounts had been opened in her name without her authorization. I relayed this information to▊. ▊discussed it with his superiors

13

at Verizon and they elected to terminate the account. ▓▓▓ called me the day after they terminated the account and told me that **Matthew Weigman**, posing as a Verizon employee, had managed to have the phone service reactivated and then switched to a phone company known as IDT.

19. I was then contacted by ▓▓▓▓▓▓▓ ▓▓▓ supervisor at Verizon, who told me that Carlton Nalley, another unindicted co-conspirator who took direction and instruction from **Matthew Weigman**, had called ▓▓▓▓▓'s group and complained that ▓▓▓ was harassing Nalley by turning off phone service at his home. The phone number Nalley provided was the phone number associated with the account in ▓▓▓▓▓'s name. This call was recorded by Verizon. During a review of the recording, ▓▓▓▓▓ recognized **Weigman**'s voice in the background. ▓▓▓▓▓ stated that the purpose for the call was to attempt to get ▓▓▓ fired or otherwise impact his livelihood in violation of 18 U.S.C.§§ 1513e. I am aware that **Weigman**, by using the identity of various AT&T employees, caused the initiation of AT&T internal investigations that could have resulted in the AT&T employees losing their employment. The identities used by **Weigman** were of AT&T employees who were involved in the investigation of **Weigman**'s criminal conduct.

20. Beginning in late April 2008, and continuing through May 2008, I was contacted repeatedly by ▓▓▓ who told me that **Weigman** was calling him at his home

14

and harassing him. ███understood **Weigman**'s calls to be harassment in preparation of being swatted and told me that he was going to let his local law enforcement personnel know this so that if and when they responded to a 911 emergency call, there would be less chance of accidental injury. ███believed that **Weigman** was calling him 1) in retaliation for his and Verizon's cooperation with law enforcement and for his acts as a witness against the defendants who had already plead guilty, and 2) in anticipation of ███ testifying against **Weigman** as part of the ongoing investigation. In order to facilitate his harassment, **Weigman** was using the identity of other Verizon employees to obtain ███'s billing records and then spoofing the numbers which███called in order to ensure ███ would answer the phone. For example, ███ would call a travel agency to arrange for a flight. A few minutes late, he would receive a phone call which appeared to be coming from the travel agency that he had just booked a flight through. When ███ answered the phone, **Weigman** would begin harassing him again. ███ was fully aware that he might be subject to violence by proxy if **Weigman** chose to make a false emergency call and was worried that **Weigman** would do so.

21.  On Sunday, May 18, 2008, I was contacted by ███and an officer from his local police department in ███████████████. They told me that **Matthew Weigman, Weigman's brother** ███**Weigman, and Sean Paul Benton**, were present at███ residence in ███████████ and being questioned. ███and the

15

officers told me that ▆ had been working in his yard when a vehicle he did not recognize pulled up to his house and three individuals emerged. ▆ did not recognize any of them and asked who they were and why they were there. **Weigman** identified himself as **Matt**, no last name, and stated that he was there because ▆ had been investigating him since 2006. ▆ realized who **Weigman** was, told **Weigman** he was not going to talk to him, and went into his residence where he contacted local law enforcement.

22. The officers advised me that **Weigman** told them as follows:

   a. He visited ▆ because ▆ was "harassing him;"

   b. He had obtained ▆'s unlisted home phone number and address by manipulating the phone company;

   c. He was there to "talk" with ▆ about ▆'s 'vendetta' against **Weigman**;

   d. He believed ▆ had a vendetta against him because **Weigman** was engaged in and was planning on continuing to place false emergency calls;

   e. He admitted to doing thing in the past that were not so nice, and that he would continue to do those things in the future; and

   f. He defined the "not so nice" things as *swatting*, that is, pretending to call 911 from a victim's phone number and reporting an emergency so as to cause a swat

team to appear at the victim's house.

23. I reviewed the officers' report, and **Benton** provided the following information:

    a.    ███ worked in the security division of Verizon;

    b.    ███ had made it so their phones were unable to dial certain types of phone numbers;

    c.    They wanted to "talk" to ███ about that; and

    d.    He and a few of his friends had a long ongoing issue with ███

24. From talking to ███ the officers, and reviewing the report, I determined that the vehicle driven by **Benton** belonged to or was registered to **Benton**. I also determined that passenger ███ Weigman lived with his brother **Matthew Wiegman**.

25. ███ told me that he felt threatened with physical violence by **Wiegman**, despite **Weigman** being blind, because **Weigman** had arrived at ███'s home without invitation, had arrived with two people, including **Weigman**'s brother who was very large and intimidating, that he knew **Weigman** was blind and must therefore have gone to great lengths to arrange for someone to drive him to ███'s house, that **Weigman** was not supposed to know where he lived, and that **Weigman** had arrived in the middle of a Sunday. ███ also recognized that **Weigman** being at ███'s residence was a clear message that **Weigman** knew enough personal identifying information to arrange for

harassment up to and including false emergency calls at ▮▮▮'s home.

26.  I reviewed mapquest.com and determined that **Weigman** and **Benton** lived within 6 miles of each other, and further that **Weigman** lived approximately 66 miles from ▮▮▮'s residence.

## CONCLUSION

27.  Based upon the facts contained in this affidavit, I submit there is probable cause to believe that **Matthew Weigman** and **Sean Paul Benton,** were intimidating, threatening, and corruptly persuading ▮▮▮▮▮▮ or attempting to do so, to hinder, delay, and prevent him from assisting federal law enforcement officers, and further influencing and attempting to influence the testimony of a federal witness and interfere with the witness's livelihood in order to retaliate against that witness for testimony he had already provided and to stop him from continuing to cooperate in the future, all in violation of 18 U.S.C. §§1512(b)(3), 1513(b) and 1513(e).

ALLYN LYND, Special Agent
Federal Bureau of Investigation

Sworn to and signed before me this ___ day of May 2008.

WM. F. SANDERSON, JR.
United States Magistrate Judge